IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| JACOB SAHR, | * | |
| | * | |
| Plaintiff, | * | 4:21-cv-00101 |
| | * | |
| v. | * | |
| | * | |
| CITY OF DES MOINES, IOWA; POLK | * | |
| COUNTY, IOWA; OFFICER BRIAN BUCK, | * | |
| in his Individual and Official | * | |
| Capacity; and UNKNOWN OFFICERS | * | |
| OF THE DES MOINES POLICE | * | |
| DEPARTMENT and POLK COUNTY | * | |
| SHERIFF'S OFFICE, in their | * | |
| Individual and Official Capacities, | * | |
| | * | ORDER |
| | * | |
| Defendants. | * | |
| | * | |

Before the Court is the City of Des Moines, Officer Brian Buck, and Unknown Officers

of the Des Moines Police Department (Defendants)'s Motion for Summary Judgment, filed

under Federal Rule of Civil Procedure 56.  ECF No. 48.  Plaintiff filed a Stipulation of Dismissal

with Prejudice as to Defendants Polk County, Iowa, and Unknown Officers of the Polk County

Sherriff's Office.  ECF No. 52.  Plaintiff Jacob Sahr filed a Resistance to Defendants' Motion for

Summary Judgment.  ECF No. 57.  Defendants filed their Reply.  ECF No. 58.  The Court heard

oral argument on January 12, 2023.  *See* ECF No. 62.  The matter is fully submitted.

I.    FACTUAL AND PROCEDURAL BACKGROUND

On the evening of May 30, 2020, Plaintiff Jacob Sahr left his home with two of his

friends and headed to Des Moines, Iowa around 10:30 p.m.  ECF No. 48-3 at 30.  That evening,

community organizers had gathered in downtown Des Moines to rally for George Floyd—an

African American man murdered by a Minneapolis Police Department Officer—and to protest against police violence and racial discrimination.  ECF No. 38 ¶ 8.  Like the protests the night prior in Des Moines, "for the most part these protests were peaceful," but instances of violence took place in the early evening hours.  ECF No. 57-2 ¶ 18; *see* Andrea May Sahouri, *Des Moines Braces for More Rallies After Friday Event Devolves Into Violence, Vandalism*, Des Moines Reg. (last updated May 30, 2020, 2:32 p.m. CST), https://www.desmoinesregister.com/story/news/2020/05/29/protestors-clash-police-riot-gear-outside-des-moines-police-department/5284962002.  Plaintiff had attended a peaceful protest outside the Des Moines Police Department earlier in the day with many community members.  ECF No. 57-4 ¶ 1.  When Plaintiff returned to the downtown area that evening, he went to a bar called The District to hang out with his friends.  ECF No. 57-2 ¶ 35.  While at the bar, he "heard banging and screaming coming from the Capitol and headed in that direction."  *Id.*

Outside the Iowa Capitol Building,[1] a large crowd had gathered.  ECF No. 48-2 at 27; DJI_0007(2), at 00:22.  At the top of the Capitol steps, a clear line of law enforcement officers had formed to halt advancement of the crowd.  DJI_0007(2), at 01:07; DJI_0008(2), at 09:01.  The officers were from the Des Moines Police Department (DMPD), Polk County Sherriff's Office, and a combined tactical unit called Metro Special Tactics and Response (Metro STAR).  ECF No. 57-2 ¶¶ 61, 62.[2]  The following events were captured by drone footage and a video

---

[1] The Court takes judicial notice of the geographical locations of the landmarks identified by the parties and the distance between those landmarks in connection with the relevant events in this case.  *See, e.g.*, *Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013) (taking judicial notice of a map provided by Google Maps because its "accuracy cannot reasonably by questioned" (quoting Fed. R. Evid. 201(b)); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007) (taking judicial notice of distance calculation that relied on information provided by Google Maps).

[2] A memorandum of understanding between the City and Polk County supporting Metro STAR was formed in 2017 with the purpose of combining to form a tactical response team.  *See* ECF No. 48-2 at 44.  "All of the personnel assigned to Metro STAR are employed by units of local government and

recorded in real time by a reporter for the Des Moines Register.  DJI_0007(2); DJI_0008(2); DJI_0009, DJI_0010; DJI_0011; Des Moines Reg. Video.  The video footage is corroborated by the DMPD dispatch log.  ECF No. 48-2 at 24–33.

Initially, DMPD received a phone call that the group at the Capitol had damaged the Polk County Courthouse earlier in the evening.[3]  ECF No. 48-2 at 27.  Acting on that information, officers in riot gear gathered in a line at the top of the Capitol steps.  Des Moines Reg. Video, at 35:30.  The crowd facing the line of officers is heard in the video chanting, "Hands up, don't shoot!"  *Id.* at 36:13.  Some protesters have megaphones, some are carrying milk jugs and water bottles in anticipation of law enforcement's use of chemical dispersants, many are holding signs, and a few are leading in chants.  *Id.*  As the protest carries on, music is heard playing in the crowd.  *Id.* at 59:42.  The crowd inches closer and closer to the officers' line while chanting in unison, "F**k the police," and "the people united can never be divided," as well as "Black lives matter."  *Id.* at 43:45, 59:53, 01:02:54.  The officers eventually make an announcement over loudspeaker, but their words are difficult to understand in the video because of the crowd noise.  *Id.* at 01:00:35.  Based on DMPD dispatch logs, the officers were announcing dispersal orders over the public-address (PA) system.  *See* ECF No. 48-2 at 27.  The first dispersal order at the Capitol was given around 11:07 p.m., the second around 11:10 p.m., and the third around 11:12 p.m.  *Id.*  Then, officers audibly announce, "Final warning to disperse, this is your final warning."  Des Moines Reg. Video, at 01:04:08.

---

assigned either full or part time to Metro STAR."  *Id.* at 46.  "During State activations, team members are considered State employees and are covered by [Iowa Code chapters 669 and 670]."  *Id.* at 47.

[3] According to DMPD dispatch logs, one person—a white male named "Cody"—was identified as throwing a "Cherry bomb" into the Polk County Courthouse around 9:30 p.m.  ECF No. 48-2 at 25.  There were also some agitators throwing bricks and damaging the windows there.  *Id.*

Shortly after the final warning, officers fired pepper spray, tear gas, and flash bangs into the crowd and most protesters dispersed from the Capitol steps and ran towards the grassy areas near the Capitol.  *Id.* at 01:07:39; DJI_0009, at 15:56.  Protesters are heard in video evidence screaming in pain, coughing, and asking if anyone has saline solution, milk, or water to wash the chemicals out of their eyes.  Des Moines Reg. Video, at 01:08:10.  Several protesters eventually re-group, but the line of officers continues pushing them westward away from the Capitol grounds using chemical dispersants.  DJI_0010, at 02:27, 16:44.  Officers continue dispersing the crowd until it crosses Finkbine Drive, and then many individuals head west down Grand Avenue, while others cross East 7th Street and walk west down Locust Street.  ECF No. 48-2 at 28; DJI_0011, at 11:35–16:30; Des Moines Reg. Video, at 01:53:23.  Cars are heard honking as the scattered group walks down the street.  Des Moines Reg. Video, at 01:53:23.  As verified by the DMPD dispatch log, officers were "able to disperse most of the crowd from the Capitol grounds shortly before midnight."  ECF No. 57-2 ¶ 47.  After the crowd is largely dispersed, the Des Moines Register reporter walks down Grand Avenue and says, "[There] doesn't look to be any immediate sign of violence going on . . . most people are in a little bit calmer spirits compared to about twenty minutes ago when that last tear gas canister was fired at the actual Capitol about five blocks back there."  Des Moines Reg. Video, at 02:02:53.

Meanwhile, Plaintiff and his friends had walked from the bar to a grassy area west of Finkbine Drive near the Capitol grounds, a distance away from the line of officers and the large group positioned on the Capitol steps.  ECF No. 57-2 ¶ 36; ECF No. 57-4 ¶ 2.  Plaintiff claims he did not hear any dispersal orders announced at the Capitol because of the distance he was from the crowd and the high level of traffic and crowd noise.  *See* ECF No. 52-2 ¶ 38.  However, when Plaintiff realized the officers were "throwing tear gas and flash bangs" at protesters, he and his

friends left and walked back to the bar on Court Avenue.  ECF  No. 57-4 ¶ 3.  Plaintiff walked

west away from the Capitol grounds down Walnut Street and then turned south onto Water

Street, taking a different route than the dispersed protesters.  *See* ECF No. 57-1 at 4.  While at

the bar, Plaintiff eventually saw a group of protesters walking east.  ECF No. 57-4 ¶ 4.  At this

point, he had left the Capitol area over an hour earlier and claims he did not recognize any

protesters.  *Id.*  Around 12:22 a.m., Plaintiff and his friend decided to leave the bar and join the

group headed east on Court Avenue.  ECF No. 57-2 ¶ 59.  In video evidence, a visible crowd

moves east across the Court Avenue bridge towards the Police Department, where nearly sixty

officers start to form a "scrimmage line" near the intersection of East 1st Street and Court

Avenue.  *Id.* ¶ 61; ECF No. 48-2 at 28.  A cluster of protesters gathers in the intersection, facing

the scrimmage line, as more individuals walk across the Court Avenue bridge.  DJI_0281, at

04:08.  The reporter for the Des Moines Register announces in real-time that a "good chunk of

the crowd here seems to have stuck together" and appeared to be heading back east.  Des Moines

Reg. Video, at 02:15:57.

    At this point, Plaintiff was walking with his friend on the sidewalk of the Court Avenue

bridge.  *See id.*; ECF No. 48-3 at 31.  Plaintiff was not chanting with the group gathered near the

scrimmage line, and he asserts his intent was to observe the protest because as a person of color,

he sympathized with the Black Lives Matter message.  *See* ECF No. 48-3 at 33 ("I stayed silent

the whole time").  Body camera videos of DMPD Officers Kelley and Spear—corroborated by

the DMPD dispatch log—captured what happened next as Plaintiff walked east down the Court

Avenue bridge sidewalk around 12:25 a.m.  *See* ECF No. 48-2 at 28.  The scrimmage line of

officers had obtained authorization for tear gas over their radios, and a small cluster of people in

the intersection of East 1st Street and Court Avenue is heard chanting, "Hands up, don't shoot!"

Kelley Body Cam, at 01:30.   About the same time, one person in a wheelchair approaches the scrimmage line.   *Id.*   Officers are heard yelling at him to "go home" and "get off the street," but their commands were not projected.   *Id.* at 01:33–01:42.   Though Spear testified there may have been a bullhorn used.   ECF No. 48-3 at 160–61.   At least one officer then warned, "You're going to get gassed," and the individual in the wheelchair screamed back, "Stop!"   Kelly Body Cam, at 02:00.   Immediately, gas was fired in the direction of the crowd and the scrimmage line charged towards the bridge after clearing the intersection at East 1st Street and Court Avenue with tear gas and flash bangs.   *Id.*

Plaintiff saw the line of officers charging towards him and grabbed his cellphone to film the incident.   In a fourteen-second video, Plaintiff captures officers rushing towards him and then passing him before he is shoved and tackled to the ground from behind by an unknown officer. *See* Sahr Video.   Plaintiff was on the sidewalk to the right side of the bridge the entire time.   *Id.* Plaintiff was not blocking the sidewalk or obstructing traffic.   *Id.*   Most of the people who were assembled had left running in various directions.   *See* DJI_0281, at 04:26.   But Plaintiff walked backwards, away from the officers.   *Id.*, at 04:40.   Next, Plaintiff is shown in video evidence being taken to the ground and surrounded by several officers while his friend stands nearby.   Des Moines Reg. Video, at 02:18:19.   Plaintiff testified about the event in his deposition as follows:

> Well, I got pushed, and I don't know if I got pushed into the bridge or if I got wedged, but then—then I turned around and then I just got tackled by a bunch of people. What showed in the video is that there's a guy that wrapped his arm around my neck and tries to throw me to the ground, and then a bunch of people started kicking and punching me and hitting me with nightsticks.

ECF No. 48-3 at 37.[4]  Plaintiff also claims that after he was struck from behind and tackled, an unknown officer took his cellphone, squatted down next to him, and attempted to gain access to his photos and videos but was unable to do so because the phone was locked.  ECF No. 57-4 at 4 ¶ 9.  Meanwhile, Plaintiff's friend—who Plaintiff alleges was not recording the incident—was permitted to stand upright the entire time.  *See* Des Moines Reg. Video, at 02:18:20.  Defendant Buck, along with the other deposed officers, testified that Plaintiff was not engaging in violent behavior at the time of his arrest.[5]  *See, e.g.*, ECF No. 48-3 at 127.  There is, however, a factual dispute about whether Plaintiff resisted arrest as officers attempted to secure his hands behind his back and restrain his legs in the prone position.  Plaintiff's version of the facts is that he was shoved from behind by someone who did not identify themselves as law enforcement, so he turned around and shoved back in response, and then was taken to the ground.  ECF No. 57-2 ¶ 78.  In video evidence, Plaintiff is on the ground and is heard saying in a frustrated tone, "I'm not doing anything!"  Des Moines Reg. Video, at 02:19:49.  And, "You're hurting my shoulder." *Id.*  DMPD Sergeant Phipps is also heard shouting, "Not everybody, not everybody," causing several officers to leave Plaintiff and assist the other officers moving west down Court Avenue. Spear Body Cam, at 02:33–02:42; ECF No. 48-3 at 92.  According to Plaintiff, he was not physically resisting arrest and was never told that he was under arrest prior to being shoved and then tackled.  ECF No. 57-1 at 9.

Plaintiff was charged with Participation in a Riot, in violation of Iowa Code section 723.1.  ECF No. 48-2 at 50–52.  Plaintiff's friend was initially charged with Disorderly Conduct

---

[4] There are disputed facts surrounding the level of force used during the arrest, but the disputes are immaterial for purposes of this Motion and will not be addressed because Plaintiff does not allege an excessive-force claim.

[5] After Plaintiff was handcuffed and arrested, Defendant Buck found a Glock 43 firearm in the front of Plaintiff's waistband.  ECF No. 48-2 at 49.  Plaintiff had a lawful permit to carry.  *Id.*

– Disrupt Lawful Assembly, in violation of Iowa Code section 723.4(4); but charges were later amended to rioting, in violation of section 723.1.  ECF No. 48-2 at 54–55; ECF No. 48-1 at 13 ¶ 89.  The rioting charge against Plaintiff was eventually dismissed.  *See State v. Sahr*, No. AGCR338739 (Iowa Dist. Ct., July 10, 2020).  Defendant Buck completed Plaintiff's arrest paperwork on the scene, but Buck claims he was not the officer who initiated the arrest.  ECF No. 48-3 at 127.  Video evidence shows Buck—wearing blue jeans and a shirt with "Police" on the arm—heavily involved in restraining Plaintiff.  Des Moines Reg. Video, at 02:18:26. Sergeant Phipps also assisted in restraining Plaintiff's legs on the ground, though he is not named as an individual defendant.  ECF No. 57-1 at 10–11.  Despite Plaintiff's attempts, there are "two unidentified officers with Metro Star patches on their left sleeve," yet to be identified.  *Id.*

　　In his Second Amended Complaint, Plaintiff claims Defendants are liable for injuries caused by false arrest/imprisonment (Count One); unreasonable seizure, in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count Two); unreasonable seizure, in violation of the Iowa Constitution article 1, section 8 (Count Three); interference with protected speech, in violation of the First Amendment under § 1983 (Count Four); and a violation of his right to freedom of speech under the Iowa Constitution article 1, section 7 (Count Five).  ECF No. 38. Defendants now move for summary judgment under Rule 56 arguing that (1) officers had probable cause, or at a minimum arguable probable cause, to arrest Plaintiff; (2) federal qualified immunity protects them against suit because they did not violate Plaintiff's clearly established rights under the First or Fourth Amendment; (3) officers did not retaliate in violation of Plaintiff's free-speech right under the Iowa Constitution; (4) Defendants are immune from liability under Iowa Code chapter 670; and (5) to the extent any *Monell* claims are pleaded against Defendant City, they fail because the City's policies and customs were constitutional,

and thus it cannot be held liable under § 1983.  ECF No. 48.  Plaintiff resists Defendants' Motion

and argues there are genuine disputes of material fact for the jury to determine at trial to deny

state and federal qualified immunity and defeat summary judgment.  ECF No. 57.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56(a) provides, "A party may move for summary judgment, identifying each claim

or defense—or the part of each claim or defense—on which summary judgment is sought."  Rule

56(a) mandates the entry of summary judgment upon a motion after there has been adequate time

for discovery "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  A factual dispute is "genuine" when the

evidence provided "is such that a reasonable jury could return a verdict for the nonmoving

party."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it

"might affect the outcome of the suit under the governing law."  *Id.*  "[T]he substantive law will

identify which facts are material."  *Id.*  At the summary judgment stage, genuine disputes of

material fact must be viewed in the light most favorable to the nonmoving party, giving that

party the benefit of all reasonable inferences.  *See* Rule 56(a); *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d

379, 382 (8th Cir. 1994).  There is an exception when video evidence blatantly contradicts a

disputed version of the facts.  *See Bernini v. City of St. Paul*, 665 F.3d 997, 1003–04 (2012)

(citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).  In that instance, the facts are viewed "in

the light depicted by a videotape that capture[s] the events in question."  *Bernini*, 665 F.3d at

1003–04 (citing *Scott*, 550 U.S. at 378–81).

In deciding whether the moving party is entitled to summary judgment, "the court does

not weigh the evidence, make credibility determinations, or attempt to discern the truth of any

factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted); *Anderson*, 477 U.S. at 248–49.  Rather, a court's focus is on whether there are any genuine disputes concerning material facts for the jury.  *Morris*, 512 F.3d at 1018*; Anderson*, 477 U.S. at 251–52.  When genuinely disputed facts must be resolved before the Court is able to enter judgment as a matter of law, then summary judgment must be denied, and the case may proceed to trial.  *See Anderson*, 477 U.S. at 248.

### III.   ANALYSIS

#### A.  Federal Claims

Congress passed the Civil Rights Act of 1871, also known as the Ku Klux Klan Act, to assist victims of racial violence in vindicating their right to equal protection under the law.  Ch. 22, §1, 17 Stat. 13.  The Act was codified under 42 U.S.C. § 1983, which states:

> Every person who, under color of [law] . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

Section 1983 provides a civil remedy against state actors and local officials for depriving any citizen of their federal constitutional or statutory rights under color of state law.  In this case, Plaintiff sues Defendants under § 1983, alleging known and unknown DMPD officers arrested him without probable cause, in violation of his Fourth Amendment guarantee against unreasonable seizure.  *See* U.S. Const. amend. IV.  Plaintiff further argues Defendant City "established an official policy, practice or custom of reckless or deliberate indifference," which caused the violation of his Fourth Amendment right.  ECF No. 38 ¶ 39; *see Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 692 (1978) (bringing municipalities within the ambit of § 1983 liability when an injury was caused by an official municipal policy or custom).  Plaintiff also

seeks § 1983 liability against Defendant officers for what he believes was a retaliatory arrest in violation of his First Amendment right.  *See* U.S. Const. amend. I.

Defendants move for summary judgment on grounds of federal qualified immunity, an affirmative defense to § 1983 liability.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). State and local government officials—including municipal law enforcement officers— "performing discretionary functions generally are shielded from liability for civil damages."  *Id.* at 818.  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, ___U.S. ___, 138 S.Ct. 577, 589–90 (2018) (citation omitted); *Bernini*, 665 F.3d at 1002.  Both prongs of this test must be satisfied for a plaintiff to survive summary judgment; thus, the district court may use its sound discretion in analyzing either prong first.  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (per curiam) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Whether the constitutional right that officers allegedly violated was clearly established at the time, and whether they "acted reasonably under settled law in the circumstances," is a question of law for the Court to determine.  *Hunter v. Bryant*, 502 U.+S. 224, 228 (1991); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).  Though this step in the qualified-immunity analysis "is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008) (citation omitted).  "In determining whether a right is clearly established, [a court] ask[s] whether it would be clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted."  *Frye v. Kansas City Mo. Police Dep't*, 375 F.3d 785, 789 (8th Cir. 2004).  This is a high burden for a plaintiff to meet—"[t]here must be

'precedent,' 'controlling authority,' or a 'robust consensus of cases of persuasive authority.'"
*Quraishi v. St. Charles Cnty.*, 986 F.3d 831, 835 (8th Cir. 2021) (quoting *Wesby*, 138 S.Ct. at
589–90).  Caselaw "must have placed the constitutionality of the officer's conduct 'beyond
debate.'"  *Wesby*, 138 S.Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  The
U.S. Supreme Court has "repeatedly stressed that courts must not 'define clearly established law
at a high level of generality.'"  *Id.* at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779
(2014)).

    1.   Fourth Amendment Seizure

    Plaintiff alleges he was arrested without probable cause in violation of his clearly
established Fourth Amendment right.  The Fourth Amendment protects the "right of the people
to be secure in their persons, houses, papers, and effects, against unreasonable searches and
seizures . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.
Probable cause exists when the totality of circumstances known at the time of arrest would
justify an officer's reasonable belief that an individual "has committed, is committing, or is about
to commit an offense."  *Johnson v. City of Minneapolis*, 901 F.3d 963, 969 (8th Cir. 2018)
(quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  In making this determination, courts
"examine the events leading up to the arrest, and then decide 'whether these historical facts,
viewed from the standpoint of an objectively reasonable police officer, amount to' probable
cause."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotation omitted); *Bell v. Neukirch*,
979 F.3d 594, 603 (8th Cir. 2020) ("[P]robable cause 'depends upon the reasonable conclusion to
be drawn from the facts known to the arresting officer at the time of the arrest.'" (quoting
*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004))).  Courts are instructed not to "engage[] in an
'excessively technical dissection' of the factors supporting probable cause," or view any one fact

in isolation.  *Wesby*, 138 S.Ct. at 588 (quoting *Illinois v. Gates*, 462 U.S. 213, 234 (1983)).
Rather, courts view the "circumstances as a whole."  *Id.*

Defendants argue the officers in this case had at least arguable probable cause to arrest
Plaintiff in the circumstances they faced.  Arguable probable cause exists when "an officer
mistakenly arrests a suspect believing [the arrest] is based on probable cause if the mistake is
'objectively reasonable.'"  *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1009 (8th Cir. 2017)
(citation omitted).  "[T]he terms 'probable cause' and 'arguable probable cause' are not
interchangeable, and each term serves a different purpose within the qualified immunity
analysis."  *Brown v. City of St. Louis*, 40 F.4th 895, 901 (8th Cir. 2022).  However, "an analysis
of arguable probable cause necessarily includes consideration of probable cause."  *Ulrich v.
Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013).  If a reasonable officer in the particular
circumstances should have known their conduct was unreasonable based on clearly established
precedent, then they cannot claim arguable probable cause.  *See Baribeau*, 596 F.3d at 478–79;
*Ross v. City of Jackson*, 897 F.3d 916, 923 (8th Cir. 2018).  Likewise, arguable probable cause
generally falls under the clearly-established prong of the qualified-immunity analysis.  *Ross*, 897
F.3d at 921–22; *Bell*, 979 F.3d at 608; *Brown*, 40 F.4th at 901 ("[The Eighth Circuit has]
assigned consideration of actual probable cause to [the] constitutional violation prong analysis
while reserving any consideration of arguable probable cause for [the] clearly established prong
analysis.").  Even when probable cause is lacking, an officer may still be "entitled to qualified
immunity if there is at least 'arguable probable cause.'"  *White v. Jackson*, 865 F.3d. 1064, 1074
(8th Cir. 2017) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)).  For
purposes of qualified immunity, Plaintiff's Fourth Amendment claim turns on whether
Defendant officers had arguable probable cause to arrest him under Iowa law.  *See Brown*, 40

F.4th at 901–02.  Accordingly, the Court will begin by determining whether "a reasonable officer, looking at the entire legal landscape at the time of the arrest[], could have interpreted the law as permitting the arrest[] here."  *Wesby*, 138 S.Ct. at 593.  However, if the officers' mistaken beliefs about probable cause were objectively unreasonable then they violated Plaintiff's Fourth Amendment right.  *E.g.*, *Walker v. City of Pine Bluff*, 414 F.3d 989, 993 (8th Cir. 2005).

As a preliminary matter, Defendants have the burden of identifying which criminal law they believed Plaintiff arguably violated at the time of his arrest.  *See, e.g.*, *Welch v. Dempsey*, 51 F.4th 809, 813 (8th Cir. 2022) (concluding the defendant failed to "identify any law that [the plaintiff] was arguably violating when he pepper-sprayed her in the face.").  Defendants cite to *Brown*, 40 F.4th at 900–01, and *Devenpeck*, 543 U.S. at 153–55, for the proposition that an arrest is lawful if officers could have arguable probable cause to arrest for any criminal offense, not only the offense charged.  In addition to participating in a riot, Defendants reference three other relevant misdemeanor offenses under Iowa Code chapter 723: unlawful assembly, failure to disperse, and disorderly conduct.  *See* ECF No. 51 at 13, 18.

Initially, Defendants seized Plaintiff for Participating in a Riot, a violation of section 723.1.  At the time of Plaintiff's arrest,[6] rioting under section 723.1 was defined as:

> [T]hree or more persons assembled together in a violent manner, to the disturbance of others, and with any use of unlawful force or violence by them or any of them against another person, or causing property damage.  A person who willingly joins in or remains a part of a riot, knowing or having reasonable grounds to believe that it is such, commits an aggravated misdemeanor.

ECF No. 57-1 at 18.  The Iowa Supreme Court has identified an additional element of the rioting offense under section 723.1.  According to *Williams v. Osmundson*, officers cannot make a

---

[6] Iowa Code section 723.1 was amended after Plaintiff's arrest.  The substance of the law remained the same, but today "[a] person who willingly joins in or remains a part of a riot" faces a Class D felony.  *See* Iowa Code § 723.1 (2023).

warrantless arrest of a nonviolent observer of a protest without probable cause to believe that he

was conducting himself in a violent manner.  281 N.W.2d 622, 624 (Iowa 1979) ("[A person]

does not Join in a riot or Remain a part of a riot, unless he conducts himself in a violent

manner").  In *Williams*, the Iowa Supreme Court held that section 723.1 is not unconstitutionally

overbroad because it cannot "be used to punish innocent bystanders."  281 N.W.2d at 624.  Thus,

the phrase "remains a part of a riot" under section 723.1, as the Iowa court construes it, means

"mere presence at the scene of a riot is not punishable."  *Id.*

Defendants distinguish *Williams* by arguing they had arguable probable cause to believe

Plaintiff rejoined a riot or unlawful assembly.  281 N.W.2d at 624 ("[S]hould an assembly

become riotous and should an individual Remain a part of the riot . . . he is properly liable to

criminal sanction.").  Defendants argue it was reasonable to infer that Plaintiff knew, or had

reasonable grounds to believe, that officers had declared this group an unlawful assembly an

hour earlier at the Capitol.  An unlawful assembly under section 723.2 is defined as:

> [T]hree or more persons assembled together, with them or any of them acting in a
> violent manner, and with intent that they or any of them will commit a public
> offense.  A person who willingly joins in or remains a part of an unlawful assembly,
> knowing or having reasonable grounds to believe that it is such, commits a simple
> misdemeanor.

ECF No. 57-1 at 19.[7]  Defendants claim they did not need individual probable cause to arrest

Plaintiff because the officers reasonably, even if mistakenly, believed he remained part of violent

"unit" of demonstrators observed violating the law and destroying property.  *See Bernini*, 665

F.3d at 1003 (citing *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009)).

---

[7] Iowa Code section 723.2 was amended after Plaintiff's arrest.  The Iowa Legislature added the
following italicized language: "A person who willingly joins in or remains a part of an unlawful
assembly, *or who joined a lawful assembly but willingly remains after the assembly becomes unlawful*,
knowing or having reasonable grounds to believe that it is such, commits an *aggravated* misdemeanor."
Iowa Code § 723.2 (2023).

Defendants also contend they could have arrested Plaintiff for Failure to Disperse, in violation of Iowa Code section 723.3.  ECF No. 51 at 13.  Under section 723.3, a failure to disperse occurs after an officer "order[s] the participants in a riot or unlawful assembly or persons in the immediate vicinity of a riot or unlawful assembly to disperse [and a] person within hearing distance of such command . . . refuses to obey."  Additionally, Defendants list Disorderly Conduct, a violation of Iowa Code section 723.4, as another chargeable offense.  ECF No. 51 at 13.  A person commits the simple misdemeanor of disorderly conduct when he or she "[e]ngages in fighting or violent behavior in any public place or in or near any lawful assembly of persons." § 723.4(1) (2020).  Further, a person may commit disorderly conduct when "[w]ithout authority or justification, [they] obstruct[] any street, sidewalk, highway, or other public way, with the intent to prevent or hinder its lawful use by others."  § 723.4(7).

While Defendants have the burden of justifying their discretionary action in making an arrest, *see Harlow*, 457 U.S. at 812, Plaintiff carries the burden of proving it was unreasonable for officers to believe they had probable cause to arrest him under the Fourth Amendment given clearly established law, *see Quraishi*, 986 F.3d at 835.  Here, Plaintiff argues that when the disputed facts are viewed in his favor, a reasonable officer should have understood that arresting Plaintiff (who was walking backwards on the sidewalk at the time) for any criminal offense violated his clearly established Fourth Amendment right against unreasonable seizure.  Plaintiff further argues that officers lacked arguable probable cause because they were on notice that their conduct violated clearly-established precedent.  *See City of Chicago v. Morales*, 527 U.S. 41, 58–60 (1999); *Bernini*, 665 F.3d at 1005; *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir 2013), *abrogated on other grounds by Laney v. City of St. Louis*, 56 F.4th 1153, 1157 n.2 (2023); *Baude v. City of St. Louis*, 476 F. Supp. 3d 900, 912 (E.D. Mo. 2020), *aff'd sub nom. Baude v.*

*Leyshock*, 23 F.4th 1065 (8th Cir. 2022).  Plaintiff argues the Eighth Circuit in *Small v. McCrystal* established that officers lack arguable probable cause to arrest a person for unlawful assembly under Iowa Code section 723.2 if that person is not "acting in a violent manner" and is walking away from officers, rather than remaining with an unlawful assembly.  708 F.3d at 1003, 1008.  *Small* involved an excessive-force claim outside the context of civil unrest, but like here, the plaintiff in *Small* was also tackled from behind without warning by an officer.  *Id.* at 1002.  The officer in *Small* was denied qualified immunity.  *Id.* at 1005.  Plaintiff argues his arrest is factually similar to *Small*, and at the time of his arrest, *Small* was controlling precedent.

Plaintiff also argues that *Bernini* put officers on notice that a "mass arrest" during a protest is unjustified unless it is "practically impossible" for officers to establish individual probable cause.  665 F.3d at 1003 (citing *Carr*, 587 F.3d at 408)).  In *Bernini*, officers reasonably believed that a large group of protesters had acted as a "unit" and committed the offenses of rioting and unlawful assembly, in violation of Minnesota law.  *Id.* at 1003–04.  Notably, the court in *Bernini* determined the unit had marched together towards an intersection and took a deliberate position directly across from a scrimmage line of officers.  *Id.* at 1004.  Many protesters wore gas masks and taunted the officers.  *Id.*  Several protesters allegedly threw feces and rocks at officers.  *Id.* at 1001.  The officers in *Bernini* were outnumbered and decided to move the large crowd to a public park to contain it temporarily because it was obstructing the roadway and "had demonstrated an intent to charge the downtown area."  *Id.* at 1004–05.  Officers then tried to determine which members of the large unit were involved in the violent confrontation with officers before they conducted a mass arrest of over two hundred protesters.  *Id.* at 1005.  The Eighth Circuit affirmed the grant of qualified immunity in favor of the officers, who "were faced with a precarious situation" and acted reasonably given the circumstances.  *Id.*

at 1004–05.  One of the reasons provided for why the officers acted reasonably in *Bernini* was their attempt to avoid arresting "innocent bystanders" not acting as a part of the threatening or violent unit.  *Id.* at 1005.

Plaintiff distinguishes *Bernini* and likens his case to *Baude*, 476 F. Supp. 3d at 910, *aff'd*, 23 F.4th at 1069.  In *Baude*, arguable probable cause was undermined because officers failed to determine which individuals were acting unlawfully.  *Id.*  Distinguishing *Bernini*, the *Baude* court held it was unreasonable for officers to believe the crowd that had gathered during the protest was acting as an unlawful unit.  *Id.*  The protesters in *Baude* were just "milling about" in the intersection and the scene was relatively calm, although some continued to exercise their First Amendment rights to voice displeasure with the police.  *Id.*  Thus, "failure to determine which members of the crowd were part of the unit acting unlawfully undermine[d] [the defendants'] argument that arguable probable cause existed."  *Id.*  (citing *Bernini*, 665 F.3d at 1004).  The district court also denied qualified immunity given the factual dispute as to what extent additional dispersal orders were given to the group prior to the mass arrest.  *Id.* at 911 (concluding there were "significant factual disputes regarding the nature, quantity, and timing of dispersal orders given to the crowd.").

Whereas in this case, Defendants counter that Plaintiff's clearly established right against unreasonable seizure was never violated given the holdings in *Bernini*, 665 F.3d at 1003, and *White*, 865 F.3d at 1075–79.  Defendants claim officers would have had at least arguable probable cause to arrest Plaintiff for riot-related conduct, disruptive activity, or failure to disperse considering the allegedly unprecedented violence officers faced between May 29 and May 31, 2020.  Defendants further argue the facts in this case are similar to *Nieters v. Holtan*, ___F.Supp.3d___, 2022 WL 3044656, at *5 (S.D. Iowa July 19, 2022), *appeal pending*, No. 22-

2600 (8th Cir. July 29, 2022).  In *Nieters*, a photojournalist covering the same protests in Des Moines on June 1, 2020—the night after Plaintiff's arrest—was seized for willingly remaining with a riot after it was ordered to disperse.  *Id.*  The defendants in *Nieters* were shielded by qualified immunity on grounds of arguable probable cause.  *Id.* at *5 (citing *Bernini*, 665 F.3d at 1003).  Defendants further contend this matter is controlled by *White* because officers had safety and traffic concerns that justified their actions in clearing the intersection and the bridge as well as arresting any individuals who failed to comply.  *See* 865 F.3d at 1078 ("[A] failure to follow an officer's orders which were grounded in officer safety created at least arguable probable cause to arrest an individual . . . .") (citing *Ehlers*, 846 F.3d at 1009–10).  In *White*, officers gave adequate dispersal orders, but the protesters refused to move.  *Id.* at 1070–73.  Thus, it was reasonable for the officers in *White* to believe the plaintiffs were aware of the violent acts by other members of the same protest and "chose not to disassociate themselves from the assembly, had heard the dispersal orders, and chose not to disperse."  *Id.* at 1076.

Here, before the Court can determine whether Plaintiff satisfies the clearly established prong of the qualified-immunity test, or whether Defendants had arguable probable cause, the Court must address the numerous factual disputes in this case.  *See* Rule 56(a).  There are at least five factual disputes: (1) whether the group on Court Avenue was violent or destroying property at the time of Plaintiff's arrest; (2) whether there was an adequate dispersal order prior to the scrimmage line of officers clearing the bridge; (3) whether walking backwards is dispersing; (4) Plaintiff's resistance to arrest; and (5) Buck's involvement in initiating Plaintiff's arrest.

First, whether the group was violent at the time is material because Defendants argue they would have arguable probable cause to arrest Plaintiff for participating in a riot, unlawful assembly, failure to disperse, or disorderly conduct.  All these crimes have an element of

violence by an individual or members of an unlawful assembly under Iowa law.  A riot is a group

of people acting violently against persons or damaging property.  *See* § 723.1.  Rioting under

section 723.1 requires "use of unlawful force or violence" by a group "assembled together in a

violent manner."  An individual must also "conduct himself in a violent manner."  *See Williams*,

281 N.W.2d at 624.  Unlawful assembly under section 723.2 requires a group of persons acting

in a violent manner "with intent that they or any of them will commit a public offense."  Failure

to disperse under section 723.3 permits officers to order dispersal of participants in a riot or

unlawful assembly, or persons in the immediate vicinity of a riot or unlawful assembly, and to

arrest anyone who fails to comply.  Disorderly conduct involves a range of behaviors including

acts of violence, threats, or disturbing others.  *See* § 723.4.

　　　This dispute is genuine because video evidence recorded at the time of Plaintiff's arrest

fails to demonstrate a violent group threatening officers or destroying property on Court

Avenue.[8]  While Lieutenant Schafnitz testified in his deposition that he thought he could hear the

"thud and crinkly sound" of water bottles being thrown at officers in videos, he also testified that

the protesters were nonviolent.  ECF No. 48-3 at 11–12.  Whereas in Buck's supplemental arrest

report dated June 2, 2020, the group at the time of Plaintiff's arrest was described as violent.

ECF No. 48-2 at 49.  However, Buck's report is contradicted by video evidence, his own

deposition testimony, and DMPD dispatch logs, which do not indicate an immediate threat of

violence or property damage on Court Avenue prior to Plaintiff's arrest.  Indeed, according to

---

[8] The record does demonstrate, however, that after Plaintiff's arrest at around 12:35 a.m. there
were allegedly rocks thrown at officers south of Court Avenue.  *See* ECF No. 48-2 at 28.  The situation
turned progressively more violent into the early morning hours of May 31, 2020.  *See id.* at 29–30.  By
2:31 a.m., several downtown buildings and businesses had broken windows and property damage.  *Id.*
But the Court does not consider these post-arrest facts relevant to determining whether officers reasonably
believed Plaintiff was in the immediate vicinity of a riot or unlawful assembly at the time of his arrest.
*See Bell v. Neukirch*, 979 F.3d 594, 603 (8th Cir. 2020).

Schafnitz, the purpose of using chemical dispersants at the time was to clear the roadway for traffic and allow officers to move into "hot spots," not to disperse riotous activity.  ECF No. 48-3 at 13.  Plaintiff was not personally conducting himself in a violent manner.  Nor was he obstructing traffic or officers while he was walking on the sidewalk of the bridge with his friend.

And yet, Defendants claim the group Plaintiff allegedly remained with was the same riotous crowd declared an unlawful assembly at the Capitol.  Minutes before Plaintiff's arrest, the Des Moines Register reporter stated, a "good chunk of the crowd here seems to have stuck together."  Des Moines Reg. Video, at 02:15:57.  But the Court concludes that even if a "good chunk of the crowd" from the Capitol remained together, that does not mean individuals walking down Court Avenue an hour later were per se acting violent and destroying property.  Plaintiff is a good example of the way the group picked up new protesters and changed behavior along the way.  A reasonable juror could find that Plaintiff never joined an unlawful assembly at the Capitol grounds since he was observing a distance from the Capitol steps in a grassy area near Finkbine Drive, and then he left for the bar.  Plaintiff did not remain with an unlawful assembly while he was at the bar.  *Cf. Williams*, 281 N.W.2d at 624 (holding an individual who remains part of a riot may be charged under section 723.1).  Additionally, there is no genuine dispute that the Capitol crowd eventually dispersed.  Indisputable video evidence demonstrates that the crowd at the Capitol was dispersed before midnight.  *See Bernini*, 665 F.3d at 1003–04 (citing *Scott*, 550 U.S. at 378).  Giving Plaintiff the benefit of all reasonable inferences based on the evidentiary record, *some* members from the Capitol protest then formed another group walking west and made a loop heading east down Court Avenue.  Video evidence also demonstrates that the group on Court Avenue was scattered, unorganized, and not congregated in a large unit in front of the scrimmage line of officers.  *Compare* DJI_0008(2), at 14:10 (depicting congregated

unit directly opposing the scrimmage line), *with* DJI_281, at 04:08 (depicting scattered pockets of individuals with a small cluster gathering in the intersection near the scrimmage line).  The scattered group had trouble organizing as someone is heard in video evidence yelling, "stay together!" at other individuals on the bridge.  Des Moines Reg. Video, at 02:15:00.  Considering the above circumstances, whether the Court Avenue group was exhibiting violence or damaging property at the time of Plaintiff's arrest is a material fact in dispute because it determines the objective reasonableness of the officers' allegedly mistaken inferences.  And contrary to Defendants' argument, Plaintiff's knowledge and intent in joining the group on Court Avenue is relevant because it is an element of the rioting offense under section 723.1.  *See also id.*; *Baude*, 23 F.4th at 1073 ("[T]here are outstanding factual questions about . . . whether the arrestees had the requisite intent to commit any of the alleged crimes.").  Because the Court cannot weigh the evidence or determine the credibility of conflicting evidence, the genuine dispute regarding whether the crowd that Plaintiff joined was violent is the prerogative of the jury.  *See Morris*, 512 F.3d at 1018; *Anderson*, 477 U.S. at 249.

Second, whether there was a dispersal order given prior to the scrimmage line clearing the Court Avenue bridge is material because without a dispersal order or adequate warning there would be no arguable probable cause to arrest Plaintiff for failure to disperse within the scope of section 723.3.  *See, e.g.*, *Quraishi*, 986 F.3d at 837 (holding officer could not "use a mistake-of-fact to claim arguable probable cause" in part because it was disputed whether officers gave adequate dispersal orders); *Baude*, 23 F.4th at 1073 (affirming denial of qualified immunity in part because of "outstanding factual questions about who heard which declarations related to unlawful assembly and dispersal orders (if any)").  *Cf. White*, 865 F.3d at 1070–73 (concluding dispersal orders provided plaintiffs with fair warning to disperse before arrest).  Buck, Kelley,

Newman, and Phipps all testified in their depositions that a dispersal order was never given before clearing the bridge—consistent with DMPD dispatch logs.  Even more so, it is questionable whether an officer yelling "go home" over two hundred feet away and without a PA system would have been audible to Plaintiff.  *See* ECF No. 48-3 at 161, Dep. of Spear (testifying that a person one hundred feet away may not have understood exactly what the officers were saying).  Whether a bullhorn was used is irrelevant because it would not project an adequate fair warning to disperse people on the bridge.  *See, e.g.*, *Vodak v. City of Chicago*, 639 F.3d 738, 745–46 (7th Cir. 2011) (finding that a bullhorn was "no mechanism . . . for conveying a command to thousands of people stretched out [over several blocks.]").  Spear's body camera video demonstrates that a minute after Plaintiff's arrest, a distinct order to "disperse immediately" was announced.  Spear Body Cam, at 03:36.  A reasonable juror could conclude this demonstrates that officers should have known a new dispersal order was necessary prior to arresting Plaintiff for failure to disperse.  Additionally, a reasonable juror could find it was unreasonable for officers to expect dispersal orders communicated at the Capitol over an hour earlier would have applied to a different location on Court Avenue.  Of course, this is another aspect of the dispute for trial.  *See Quraishi*, 986 F.3d at 838 (concluding dispute over whether declaring one location an unlawful assembly extended to another location was issue for the jury).

Third, a reasonable juror could interpret walking backwards as dispersing, in compliance with section 723.3.  There is no question that Plaintiff was walking backwards on the sidewalk, away from officers before his arrest.  *See* DJI_0281, at 04:40.  Several officers testified in their depositions that a person would not have to run away to disperse—walking away would suffice.  *See, e.g.*, ECF No. 48-3 at 12.  Spear testified that after reviewing video evidence, Plaintiff was dispersing.  *Id.* at 160.  It is undisputed that Plaintiff was walking backwards, but whether

Plaintiff was dispersing by doing so—and thus, not violating section 723.3—is a disputed fact for the jury and material to a finding of arguable probable cause.

Fourth, Plaintiff's resistance to arrest is a material fact in dispute. Defendants claim Plaintiff's conduct was resistant to lawful instruction and video evidence shows Plaintiff resisting arrest. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Plaintiff disagrees. Plaintiff's resistance, if any, aides in the arguable probable cause analysis because it could provide independent grounds for an arrest. *See United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) ("The struggle that ensued when the state trooper attempted to handcuff [the suspect] . . . would provide a reasonable police officer with probable cause for an arrest under Iowa law."). "[S]everal courts consider resistance to even an illegal arrest to be grounds for a second, legitimate arrest." *Id.* at 1430–31. This dispute is genuine because the only close-up video of the arrest was recorded by the Des Moines Register reporter and DMPD body camera videos. But the second-by-second take down of Plaintiff from the initial alleged shove, to tackle on the ground and then arrest, was never fully captured. Defendants assert that video evidence clearly shows Plaintiff resisting arrest, but the Court disagrees. What the video does capture is Plaintiff being restrained by a handful of officers—including Buck—and telling officers he did not do anything wrong and that they were hurting his shoulder. *See Scott*, 550 U.S. at 380. He was not clearly resisting arrest in any of the snippets of video provided to the Court; thus, Plaintiff's resistance is genuinely disputed. *Cf. Brown*, 40 F.4th at 898, 902 (relying on video evidence clearly showing the rallygoer's resistance).

Fifth, the parties dispute whether Defendant Buck joined in initiating Plaintiff's arrest. Buck testified at his deposition that he witnessed the "scuffle" from a distance and as he approached, unknown officers were attempting to place handcuffs on Plaintiff. ECF No. 48-3 at

127, 135.  Plaintiff argues Buck fully observed and joined other officers in initiating his arrest

less than ten seconds after Plaintiff was taken to the ground.  ECF No. 57-2 ¶ 84.  Video

evidence shows Buck actively involved in restraining Plaintiff, and Buck completed the arrest

paperwork.  The Court concludes the distinction between whether Buck observed and initiated

the arrest, versus only restraining Plaintiff during the arrest, is neither material nor genuine.

Uncontroverted video evidence shows Buck personally involved in Plaintiff's arrest, which is

sufficient to subject him to liability under § 1983.  *Cf. White*, 865 F.3d at 1081 (concluding

officer's mere presence at the scene without any personal involvement in the alleged unlawful

conduct was insufficient to hold officer liable under § 1983).

Without a doubt, the parties' interpretations of what happened in this case could not be

more opposite.  But since Plaintiff is the nonmoving party, all genuinely disputed facts and

reasonable inferences from those facts are viewed in the light most favorable to him.  *See* Fed. R.

Civ. P. 56(a); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Harlston*, 37 F.3d at 382.

Accordingly, a reasonable juror could find Plaintiff was a nonviolent observer and did not rejoin

an unlawful assembly or riot.  *See Baude*, 476 F. Supp. 3d at 910.  Defendants at oral argument

agreed that a mass arrest did not occur on Court Avenue—it was an arrest of Plaintiff and his

friend—which supports the argument that individual probable cause could have been established.

The Court acknowledges that officers would have been acutely familiar with the destruction

caused by some protesters two days earlier on May 29, and then again on May 30.  *See Pringle*,

540 U.S. at 371; *Bell*, 979 F.3d at 603.  But a reasonable juror could find that Plaintiff was a

nonviolent observer of a protest during the early morning hours of May 31, and thus should not

have been arrested if neither he, nor the group in his immediate vicinity, was acting as a violent

unit at the time.  *Bernini*, 665 F.3d at 1003, 1005.  In addition, viewing the facts in the light most

favorable to Plaintiff, there was a lack of fair warning before officers dispersed the crowd on

Court Avenue. *See Morales*, 527 U.S. at 58. *White* is thus distinguishable because the officers

in that matter had adequately warned protesters over loudspeakers and "loud verbal commands"

that the "skirmish line" was going to clear the area, and protesters needed to "turn around and

walk the other away." 865 F.3d at 1070–73, 1078. Regardless, a reasonable juror could find that

Plaintiff was dispersing by walking backwards away from officers. *E.g.*, *Small*, 708 F.3d at

1003. And finally, this case is distinct from *Nieters*. 2022 WL 3044656. Plaintiff left the

vicinity of the Capitol by walking in the opposite direction towards a bar on Court Avenue and

stayed there for some time before joining a group walking down Court Avenue. Plaintiff stayed

on the sidewalk the entire time. Whereas the plaintiff in *Nieters* "followed a group headed west .

. . , witnessed a physical altercation between twelve individuals and two law enforcement

officers," and yet remained with a large unit declared an unlawful assembly. *Id.* at *2

  In conclusion, viewing the facts in Plaintiff's favor, it was clearly established at the time

of Plaintiff's arrest that the officers' conduct in arresting him was objectively unreasonable and

in violation of Plaintiff's clearly established Fourth Amendment right. Officers could not

disperse or arrest nonviolent individuals observing a protest unless (a) there was a fair warning to

disperse, and (b) the individual had a reasonable opportunity to comply with the officer's

commands. *See Morales*, 527 U.S. at 58; *e.g.*, *Vodak*, 639 F.3d at 746; *Jones v. Parmley*, 465

F.3d 46, 60 (2d Cir. 2006) (denying qualified immunity because "defendants concede that they

issued no dispersal order and instead stood in a 'skirmish line,' waited thirty-five seconds, and

then charged into the crowd, arresting protesters indiscriminately."); *see also Baude*, 476 F.

Supp. 3d at 911. Even if a reasonable juror could conclude there was a dispersal order that

applied to the group on Court Avenue, officers were on notice that they could not seize a

nonviolent, nonthreatening individual from behind if he was complying with officer commands to disperse by walking away.  *See Small*, 708 F.3d at 1004–05.  Additionally, while probable cause does not require an actual showing of Plaintiff's violent activity, there must still be "a 'substantial chance'" that Plaintiff was violating Iowa law.  *Johnson*, 901 F.3d at 967 (quoting *Wesby*, 138 S.Ct. at 586–88); *Gates*, 462 U.S. at 243 n.13.  Here, when the record and all reasonable inferences from the evidence are viewed in Plaintiff's favor, there was no substantial chance that Plaintiff was violating Iowa law.  A reasonable officer on the scene would have been on notice that they lacked arguable probable cause to arrest Plaintiff in these circumstances.  *See Morales*, 527 U.S. at 58; *Small*, 708 F.3d at 1003; *Baude*, 476 F. Supp. 3d at 911, *aff'd*, at 23 F.4th 1065; *cf. Bernini*, 665 F.3d at 1003, 1005*; see also, e.g.*, *Jones*, 465 F.3d at 60; *Vodak*, 639 F.3d at 746; *see generally Baribeau*, 596 F.3d at 478.  In sum, clearly-established precedent placed the unlawfulness of Plaintiff's arrest under the Fourth Amendment "beyond debate." *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741).

Finally, "[l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed."  *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).  However, after extensive discovery and the opportunity to amend his complaint, Plaintiff is still unable to identify two Metro STAR officers involved in his arrest—tactical officers employed by either DMPD or Polk County.  *See* ECF No. 48-2 at 44–47.  The Eighth Circuit has "held that if there has been 'extensive discovery[,]' and the plaintiff if still only able to allege bare legal conclusions, the case should be dismissed."  *Green v. City of St. Louis*, 52 F.4th 734, 740 (8th Cir. 2022) (alteration in original) (quoting *Faulk v. City of St. Louis*, 30 F.4th 739, 746 (8th Cir. 2022)); *see also Perez v. Does 1-10*, 931 F.3d 641, 646 (8th Cir. 2019) ("The Second Amended Complaint does not sufficiently allege who the Doe Defendants are, what they

27

allegedly did, what their position is for the City, or any other facts that would permit the Doe

Defendants to be noticed or identified through discovery."). Plaintiff already stipulated to

dismissal of unknown officers of the Polk County Sheriff's Office. ECF No. 52. Plaintiff does

not contend that this is an instance of conspiracy to cover up the allegedly unlawful arrest and

deprive Plaintiff of his § 1983 claim. *See, e.g.*, *S.L. ex rel. Lenderman v. St. Louis Metro. Police

Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 851–53 (8th Cir. 2013). Nor is this a case where

there is evidence in the record that makes it easy to identify the unknown officers personally

involved in Plaintiff's arrest. *See White*, 865 F.3d at 1081. Holding unknown DMPD officers

liable under § 1983 at this stage would not serve any deterrent purpose. Thus, Plaintiff's claims

against the unknown DMPD officers must be dismissed. *See Green*, 52 F.4th at 740; *Perez*, 931

F.3d at 646. For similar reasons, the unknown DMPD officers are dismissed as to Plaintiff's

state law claims. The unknown defendants would lack fair notice of the allegations against them

personally, and Plaintiff is unable to identify them after extensive discovery, including the

depositions of eleven DMPD officers. The claims against Defendant Buck, however, remain.

Due to genuine disputes of material fact, as well the lack of entitlement to qualified immunity,

Defendant Buck's Motion is denied as to Plaintiff's Fourth Amendment claim. The Court will

next address Defendant City's liability, if any, for Buck's allegedly unconstitutional arrest.

2. *Monell* Claim Against the City

Plaintiff alleges a *Monell* claim under § 1983 against Defendant City for Defendant

Buck's alleged violation of Plaintiff's Fourth Amendment rights (Count Two). ECF No. 38 ¶ 39.

Plaintiff claims the City had an unwritten official policy, custom or practice of arresting

nonviolent bystanders in the "mere presence at the scene of a riot," in contravention of *Williams*.

281 N.W.2d at 624–25. In support of his argument, Plaintiff asked several DMPD officers a

hypothetical question based on *Williams*.  Plaintiff asked Sergeant Wellman and Officers Kelley,

Buck, Spear, Holtan, and Newman the following during their depositions:

> Say there's ten people on a corner of a street gathered into a group and three of
> them start throwing bricks at the police . . . and then the other seven people remain
> a part of that group after they see it happening. . . . From your understanding of the
> [DMPD] policy, are you allowed to arrest all ten people?

ECF No. 48-3 at 106.  Most officers testified they could arrest all ten but would use their

discretion to only arrest the law violators.  Kelley testified he would have discretion to arrest all

ten under Iowa law, but he would try to identify the aggressors and then disperse the rest.  *Id.*

Buck testified he had authority to arrest all ten based on DMPD policies.  *Id.* at 123.  Spear

testified he would assume he had authority to arrest all ten, but personally he would rather arrest

the brick-throwers.  *Id.* at 154.  Wellman and Holtan testified they would have authority to arrest

all ten if they remained with the violent group.  *Id.* at 173, 183–84.  Newman testified he could

arrest all ten under Iowa law and DMPD policy, but the custom or practice was to pinpoint the

aggressors and then arrest them, rather than the whole group.  ECF No. 57-4 at 20.  Plaintiff

argues that Defendants' understanding of Iowa law contravenes *Williams* because officers would

only have probable cause under section 723.1 to arrest individuals conducting themselves

violently.  Thus, according to Plaintiff, Buck acted in furtherance of an unlawful policy, custom

or practice at the time of Plaintiff's arrest.  Plaintiff argues the City's "deliberate indifference" to

his constitutional rights is demonstrated by the November 2020 Crowd Management policy,

which fails to expressly discourage the arrest of nonviolent bystanders during a protest.  It is

undisputed that the written policy is consistent with the custom that existed at the time of

Plaintiff's arrest.  *See* ECF No. 48-1 ¶ 99; ECF No. 57-4 at 63.  However, Defendants deny that

the custom was unlawful or that the City caused a violation of Plaintiff's Fourth Amendment

rights for *Monell* liability to apply.

"Liability for city officials in their official capacities is another form of action against the city, and it requires [a] showing that a policy or custom caused the alleged violation." *Rogers v. City of Little Rock*, 152 F.3d 790, 800 (8th Cir. 1998) (citing *Monell*, 436 U.S. at 690 n.55). Respondeat superior liability for the unlawful act of a municipal employee does not exist under § 1983. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 410 (1997). Thus, a court's first determination must be "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "Policy and custom are not the same thing." *Corwin v. City of Independence*, 829 F.3d 695, 699–700 (8th Cir. 2016). An "'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986). An official policy must be made by a decisionmaker with final policymaking authority, as determined by state law. *Id.* at 483; *see also St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Often such authority is distributed "among various officers and official bodies," to adjust to the particular circumstances. *Pembaur*, 475 U.S. at 483. When a decisionmaker is responsible for deliberately choosing "to follow a course of action . . . from among various alternatives," municipal liability attaches. *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). In certain situations, a single unconstitutional decision made by a policymaker or final decisionmaker may constitute an official policy to hold a municipality liable. *Id.* at 480–81.

Absent an official policy, a plaintiff may bring a claim alleging that a municipality's unlawful custom or practice caused a constitutional violation. *See Canton*, 489 U.S. at 390. Demonstrating an unlawful custom or practice requires:

(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014); *Brown*, 520 U.S. at 400, 405.  When a plaintiff alleges a municipal policy or custom caused an officer to act with conscious disregard or deliberate indifference to a person's rights, typically it is in the context of a failure-to-train or -supervise theory of liability.  *See generally Canton*, 489 U.S. at 389 ("[T]he need for more or different training [must be] so obvious" for *Monell* liability to attach); *Brewington v. Keener*, 902 F.3d 796 (8th Cir. 2018).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Brown*, 520 U.S. at 409).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.*  It is rarely the case "that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Id.* at 64.  Furthermore, in most instances, "an isolated incident of alleged police misconduct . . . cannot, as a matter of law, establish a municipal . . . custom creating liability under § 1983."  *Ulrich*, 715 F.3d at 1061; *Connick*, 563 U.S. at 61–62.

Here, even when viewing the disputed facts in Plaintiff's favor, the Court concludes Defendant City cannot be held liable under *Monell* for an unconstitutional policy, custom or practice.  There is a missing "direct causal link" between the City's actions and the alleged constitutional deprivation by Defendant Buck.  *Harris*, 489 U.S. at 385.  First, Plaintiff fails to

present evidence of an unconstitutional DMPD policy on crowd control adopted and

promulgated at the time of Plaintiff's arrest.  Plaintiff relies on the hypothetical question based

on state law posed to several DMPD officers—including Defendant Buck—to demonstrate that

there was an unwritten policy that caused Buck's allegedly unconstitutional actions.  However,

other than Buck, DMPD officers seem to have generally understood that they should only arrest

members of the crowd who were conducting themselves in a violent manner, or those who

willingly remained with a riotous crowd.  *See Williams*, 281 N.W.2d at 624.  The Court disagrees

with Plaintiff that the responses to the hypothetical question demonstrate an unconstitutional,

unwritten policy condoning the type of unlawful arrest under the Fourth Amendment in this case.

It is a stretch to conclude that a "fixed plan[] of action" existed based on the officers' testimony,

as many officers testified that they would use their discretion to arrest, depending on the

circumstances.  *See Pembaur*, 475 U.S. at 480–81.  An official policy to specifically arrest

peaceful observers of a protest in contravention of clearly established federal precedent does not

exist in the record before the Court.

More so, Plaintiff never clearly identifies who the final decisionmakers were at the time

the alleged unwritten policy was carried out.  *Id.*  For example, Lieutenant Schafnitz was the top

commander at Metro STAR, but he was at the Metro STAR office near the Police Department at

the time of Plaintiff's arrest.  Schafnitz reported to Captain Wessels, and Schafnitz testified that

authorization to clear the bridge was communicated by an unknown officer leading the team, but

discretion to arrest protesters would have been left to individual officers.  *See* ECF No. 48-3 at 8,

13; *see also* ECF No. 57-4 at 21, 25; ECF No. 48-3, Dep. of Kelley at 107 (testifying that order

to clear bridge was likely given in person by an officer); *id.* at 79, Dep. of Nydam (testifying that

each Metro STAR team had a leader who was an officer, rather than a supervisor).  In other

words, Schafnitz was not out on the bridge directing officers to follow an unwritten policy.  The

Court could also assume Plaintiff contends the policymaker was Wessels.  But Wessels testified

that he was at the Capitol when the bridge was cleared.  ECF No. 57-4 at 64.  He testified that he

had earlier discussed with unknown decisionmakers in the Polk County Attorney's Office the

plan for the night of May 30 into the morning of May 31 in terms of available charges, but there

is no indication in the record that Wessels was responsible for choosing how the dispersal orders

or arrests would be carried out.  *Id.* at 62; *see also Brewington*, 902 F.3d at 802 (holding a

plaintiff must offer evidence that a decisionmaker or higher-ranked officer instructed officers to

follow an unconstitutional practice or custom).  According to Wessels, his job at the time was to

secure resources—i.e., officers from other agencies—that could be deployed throughout the City.

ECF No. 57-4 at 63–64.  The record lacks evidence that Wessels, or any high-ranked

commander, decided an unconstitutional course of conduct that was the "moving force" behind

the alleged unlawful arrest.  *Snider*, 752 F.3d at 1160.

In addition to Plaintiff failing to meet his burden in identifying who the final

decisionmaker was in this instance, and demonstrating they condoned the unconstitutional

conduct at issue, the Court declines to rely on the written Crowd Management policy adopted six

months after Plaintiff's arrest in determining whether an unlawful policy existed at the time.

Even if the policy was determinative, Plaintiff fails to direct the Court to which sections of the

Crowd Management policy are facially unconstitutional.  Plaintiff argues the policy cites to Iowa

Code sections on rioting and unlawful assembly; yet it lacks clarification from *Williams* about

avoiding the arrest of individuals in the mere presence of a riot, and only arresting individuals

conducting themselves in a violent manner.  However, in addition to officers being permitted to

exercise their discretion in the specific circumstances they might face, reading the policy as a

whole, there are provisions under sections IV and V that align with *Williams*.  *See* ECF No. 57-4

at 9 ("The primary objective of the [incident commander] at a demonstration or civil disturbance

is to accomplish the following . . . . Arrest law violators, including those responsible for property

damage, and attempt to remove or isolate persons inciting violent behavior when safe or

feasible."); *id.* at 12 ("A supervisor may allow a legal observer or crowd monitor to remain in the

area after a dispersal order if circumstances permit and if the person's presence would not unduly

interfere with the enforcement action.").  The policy is not facially unconstitutional under the

Fourth Amendment, nor would such a policy direct Defendant Buck to violate Plaintiff's rights.

Second, while Captain Wessels testified there was a preexisting custom and practice

consistent with the November 2020 written Crowd Management policy, this does not mean the

custom at the time was to unconstitutionally arrest nonviolent observers of a protest.  *See* ECF

No. 57-4 at 63.  Other than this instance, the record lacks evidence of a widespread history of

DMPD officers unreasonably apprehending nonviolent, innocent bystanders during large-scale

protests to constitute a widespread custom or practice.  *See Brown*, 520 U.S. at 404.  Further,

Plaintiff does not clearly plead a claim for failure to train or supervise.  Even if such claims were

pleaded, denial would be appropriate.  There was a memorandum of understanding with Metro

STAR, and the record indicates Defendants should have been equipped to respond to civil unrest

and deploy lawful tactical response measures as needed.  *See* ECF No. 48-2 at 44–47; ECF No.

48-3 at 6–7, Dep. of Schafnitz (testifying that while he was a commander of Metro STAR, he

recalled several trainings on crowd control and protest demonstrations); *see also Connick*, 563

U.S. at 63–64.  What is more, the record is devoid of information suggesting the City's

policymakers would have been on notice of a pattern of misconduct, or a widespread custom of

unlawful arrests prior to Plaintiff's arrest.  *See Brown*, 520 U.S. at 407; *Clinton v. Garrett*, 551 F.

Supp. 3d 929, 957 (S.D. Iowa 2021), *aff'd*, 49 F.4th 1132 (8th Cir. 2022) ("[Plaintiff] presents no

viable support for his assertion that [the chief of police] or other City officials were aware of this

pattern.").  Prior to the George Floyd protests, the City would not have known that additional

training on implementing *Williams* in the context of civil unrest was "so patently obvious" that

the City could be held liable for failure to train under *Monell*.  *Connick,* 563 U.S.at 64.

Additionally, while the Court understands the Polk County Attorneys' Office and DMPD

promulgated a blanket charging policy that applied retroactively to several people booked in jail

on May 30 and May 31, 2020; the details of those arrests are absent from the record.  Without

further evidence this cannot support a widespread custom or practice.  *See* ECF No. 48-2 at 58–

63.  In these circumstances, the single alleged instance of unlawful conduct by Buck is

insufficient to support an unconstitutional custom or practice for municipal liability.  *See Tuttle*,

471 U.S. at 821–22, 824; *Connick*, 563 U.S. at 61–62; *Ulrich*, 715 F.3d at 1061.  In summary,

Plaintiff has failed to demonstrate an unlawful municipal policy, custom or practice caused the

violation of his rights.  *See Snider*, 752 F.3d at 1160; *Brown*, 520 U.S. at 400, 405.  Thus,

Defendant City cannot be held liable under § 1983.  *See Canton*, 489 U.S. at 386.

    3.   First Amendment Retaliation

    Next, Plaintiff alleges his First Amendment right to freedom of speech was violated.

Plaintiff contends that Defendant Buck arrested him in retaliation for exercising a

constitutionally protected activity: filming and documenting law enforcement activities during a

protest.  ECF No. 38 ¶ 54.  There are four components of a First Amendment retaliatory-arrest

claim.  *See Welch*, 51 F.4th at 811.  "[A] plaintiff must show that (1) [they] engaged in protected

activity, (2) the officer [took an adverse action] that would chill a person of ordinary firmness

from continuing the protected activity, . . . (3) the [adverse action] was motivated by the exercise

of the protected activity," and (4) "the officer acted without probable cause to arrest." *Id.* (first

citing *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014); and then *Nieves v. Bartlett*, 139 S.Ct.

1715, 1723 (2019)).  Regarding the third, causation element of a retaliatory-arrest claim, the U.S.

Supreme Court in *Nieves* held an arrest is "motivated by" retaliatory animus if it was the "but-for

cause" of the unlawful arrest.  139 S.Ct. at 1725.

Here, Plaintiff argues the "but-for cause" or "motivating factor" behind his arrest was

retaliatory animus for recording and observing officers during the protest.  *See Mt. Healthy City*

*Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Nieves*, 139 S.Ct. at 1725.  According

to Plaintiff, the right to observe and record officers stems from *Walker*, 414 F.3d at 993, and

*Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020).  Plaintiff argues that while the Eighth

Circuit has not decided whether a right to record the police exists under the First Amendment,

"the right may still be clearly established based on a 'consensus of cases of persuasive authority'

from other jurisdictions." *Irizarry v. Yehia*, 38 F.4th 1282, 1294 (10th Cir. 2022) (citation

omitted); *al-Kidd*, 563 U.S. at 742.  Plaintiff also contends it is well-established that criticism of

government officials is at "the very core of speech protected by the First Amendment." *Hoyland*

*v. McMenomys*, 869 F.3d 644, 655 (8th Cir. 2017) (citation omitted).  For these reasons, Plaintiff

argues it was clearly established that Defendant Buck's arrest violated his right to observe and

record police officers under the First Amendment.  Thus, according to Plaintiff, Buck should be

denied qualified immunity and the case permitted to proceed to trial on the alleged factual

dispute surrounding Buck's retaliatory animus.

Defendants counter that Buck is shielded by qualified immunity because the First

Amendment is not supportive of participation in riotous activity, nor conduct that threatens

police or property, as allegedly occurred here. *See Reichle v. Howards*, 566 U.S. 658, 668

(2012); *Quraishi*, 986 F.3d at 839.  Even if Buck lacked probable cause to arrest Plaintiff, Defendants contend that Plaintiff cannot prove the "but-for cause" or motivating factor behind his arrest was retaliatory animus, or that the arrest would not have occurred "but for" Plaintiff recording officers.  *See Nieves*, 139 S.Ct. at 1725; *Mitchell v. Kirchmeier*, 28 F.4th 888, 896–97 (8th Cir. 2022).  At oral argument, Defendants raised the issue of whether video evidence also depicts Plaintiff's friend using a video camera, which they claim supports the argument that Plaintiff was never "singled out" because of the exercise of his constitutional rights.  *See Baribeau*, 596 F.3d at 481.  According to Defendants, Plaintiff's argument fails because his arrest was motivated by what officers reasonably believed was unlawful conduct.  *See id.*

In general, "debate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Likewise, "[c]riticism of law enforcement officers, even with profanity, is protected speech."  *See Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019) (citing *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)).  While free speech is not absolute, the U.S. Supreme Court has made it clear that citizens who are angry with their societal conditions and the trampling of their rights may broadly express their views, regardless of the unsettling effects such speech may cause.  *See generally Edwards v. South Carolina*, 372 U.S. 229 (1963); *Brown v. Louisiana*, 383 U.S. 131 (1966).  There is no question that the right to protest and express displeasure with the police was clearly established.  But given Buck's affirmative defense the question here is whether a reasonable officer should have known that the right to record police officers in these circumstances was a clearly established right under the First Amendment.  *See Seymour*, 519

F.3d at 798 (citation omitted).  If so, then the Court must decide whether Plaintiff has alleged

facts demonstrating a retaliatory arrest.  *See generally Baribeau*, 596 F.3d at 474.

In this instance, after oral argument on Defendants' Motion, the Eighth Circuit

determined two on-point Fourth Amendment cases decided before May 2020—*Chestnut* and

*Walker*—never established that a person has a First Amendment right to record or observe

officers in the performance of their public duties.  *Molina v. City of St. Louis*, 59 F.4th 334, 338

(8th Cir. 2023) ("[N]either of these Fourth Amendment cases can clearly establish a First

Amendment right to observe police officers.").  The Eighth Circuit's position is contrary to "the

First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits[, which] have all concluded in

published opinions that the First Amendment protects a right to film the police performing their

duties in public."  *Irizarry*, 38 F.4th at 1294.  *Irizarry* adds the Tenth Circuit to the list, bringing

the total number of federal circuits that have recognized the right to observe or record police

officers to seven.  As the U.S. Supreme Court held in *Brown v. State of Louisiana*, citizens are

guaranteed freedom of speech and the right is "not confined to verbal expression. . . . [It]

embrace[s] appropriate types of action which certainly include the right in a peaceable and

orderly manner to protest by silent and reproachful presence, in a place where the protestant has

every right to be."  383 U.S. at 141–42.

Despite the majority of circuits holding otherwise, this Court is bound by Eighth Circuit

precedent.  Thus, Buck would have lacked notice that he was violating Plaintiff's First

Amendment right in the specific circumstances he faced, even assuming a reasonable juror could

find Plaintiff never joined or remained with an unlawful assembly or riot.  *See Molina*, 59 F.4th

at 338; *Plumhoff*, 572 U.S. at 779.  Indeed, the Eighth Circuit never concluded that a person has

such a right.  *See Molina*, 59 F.4th at 338.  Therefore, Plaintiff cannot establish the clearly

established prong to defeat qualified immunity.  Following the rule of constitutional avoidance, the Court need not address the merits of Plaintiff's First Amendment retaliation claim, though the absence of probable cause is "weighty evidence that the officer's animus caused the arrest." *Nieves*, 139 S.Ct. at 1724.  Because the lack of clearly established law resolves Plaintiff's federal free-speech claim on qualified immunity grounds, it fails as a matter of law.  *E.g.*, *Laney*, 56 F.4th at 1159; *see also Pearson*, 555 U.S. at 245; *Scott*, 550 U.S. at 388.

To summarize, Plaintiff's claims against the unknown DMPD officers are dismissed. Defendant Buck is denied qualified immunity under Count Two, but Defendant City is not liable under *Monell*.  Plaintiff's Fourth Amendment unlawful-seizure claim (Count Two) against Buck survives summary judgment because there are several genuine disputes of material fact for the jury to determine at trial.  In addition, Defendants' Motion is granted as to Plaintiff's First Amendment retaliatory-arrest claim against all Defendants (Count Four).

### B.   Remaining State Claims

Plaintiff also alleges a common-law false arrest/imprisonment claim (Count One), free-speech claim under article I, section 7 of the Iowa Constitution (Count Three), and unreasonable-seizure claim under article I, section 8 of the Iowa Constitution (Count Five) against the City and Buck.  ECF No. 38 at 8, 11.  Defendants move for summary judgment and allege that Iowa never formally recognized a direct cause of action under article 1, sections 7 and 8 of the Iowa Constitution.  According to Defendants, federal courts have merely assumed the rights exist. Assuming for the sake of argument that Plaintiff has a right to bring direct constitutional tort claims, Defendants argue their actions are immunized by the Iowa Municipal Tort Claims Act (IMTCA), chapter 670 of the Iowa Code.  *See* Iowa Code § 670.4(1)(c)(2020); *Baldwin v. City of Estherville (Baldwin III)*, 333 F. Supp. 3d 817, 832 (N.D. Iowa 2018).  According to Defendants,

if Buck "exercis[ed] due care" in performing his official duties, then Defendants are immune from damages liability.  § 670.4(1)(c).  Defendants contend that evidence of a lack of due care is absent from the record.  In the alternative, Defendants argue they are immune under the newly enacted Iowa Code section 670.4A for the same reasons they argued in support of their federal qualified-immunity defense.  § 670.4A (effective June 17, 2021).  Defendants contend that section 670.4A should apply retroactively because Plaintiff amended his complaint after section 670.4A was enacted, changing the date his action accrued.  Thus, Defendants argue they are entitled to summary judgment on Plaintiff's state constitutional and common-law tort claims under Rule 56 on grounds of qualified immunity.

Plaintiff argues the Iowa Supreme Court has implied that article 1, sections 7 and 8 of the Iowa Constitution are self-executing.  *See Meyer v. Herndon*, 419 F. Supp. 3d 1109, 1127–29 (S.D. Iowa 2019) (citing *Godfrey v. State*, 898 N.W.2d 844, 870–72 (Iowa 2017)); *Venckus v. City of Iowa City*, 930 N.W.2d 792, 809–10 (Iowa 2019).  Plaintiff contends that there are no other adequate remedies at law and therefore he may bring direct constitutional claims for the violation of his rights, in addition to his common-law false-arrest claim.  Further, Plaintiff resists retroactive application of section 670.4A and argues Defendants should be subject to the due-care standard, rather than the federal qualified-immunity standard adopted under section 670.4A.  *See Baldwin v. City of Estherville (Baldwin II)*, 915 N.W.2d 259, 279 (Iowa 2018); *Williams v. City of Burlington*, 516 F. Supp. 3d 851, 872–73 (S.D. Iowa 2021), *aff'd*, 27 F.4th 1346 (8th Cir. 2022).  Plaintiff argues his cause of action accrued on May 31, 2020, the date he was arrested and the date his rights vested.  Thus, his Second Amended Complaint relates back to the same conduct alleged in his original complaint.  Additionally, Plaintiff contends the Iowa Supreme Court addressed a similar statutory retroactivity argument in *Thorp v. Casey's General Stores,*

*Inc.*, 446 N.W.2d 457, 461–62 (Iowa 1989) (concluding that application of a subsequently enacted statute to deprive a plaintiff of an accrued cause of action would violate due process). Plaintiff further argues the Iowa legislature did not expressly state section 670.4A was to be applied retroactively.  *See Dindinger v. Allsteel, Inc.*, 860 N.W.2d 557, 563 (Iowa 2015) ("There is a general presumption that newly enacted statutes apply only prospectively.").  The qualified-immunity amendments that Defendants wish to apply under section 670.4A are substantive, according to Plaintiff, and thus cannot be applied retroactively.  *See id.* at 563–64.  Finally, Plaintiff makes a separation of powers argument that the Iowa legislature exceeded the scope of its authority in defining the meaning of the Iowa Constitution and in limiting the impact of rights guaranteed by the Iowa Constitution by the enactment of section 670.4A.

    1.  False Arrest/Imprisonment

Common-law claims of false arrest implicate the Fourth Amendment right to be free from unreasonable seizures.  *See* U.S. Const. amend. IV.  The two elements of "false arrest are (1) detention or restraint against one's will and (2) unlawfulness of the detention or restraint." *Children v. Burton*, 331 N.W.2d 673, 678–79 (Iowa 1983)).  The torts of false arrest and false imprisonment have similar elements and are used interchangeably.  *See id.* at 678.  In addition, under Iowa Code section 804.7, a warrantless arrest may be made if an officer has a "reasonable ground for believing that an indictable public offense has been committed . . . [and reasonably believes] that the person to be arrested has committed it."  § 804.7(3).  An indictable public offense is "an offense other than a simple misdemeanor."  Iowa Code § 801.4(8).  This statutory "reasonable ground" standard is an objective one based on facts that a reasonable officer would know at the time, but it "is not identical to the federal constitutional standard."  *See Veatch v. City of Waverly*, 858 N.W.2d 1, 7–9 (Iowa 2015) (citing § 804.7(3) and holding only "an

indictable offense can support an arrest retrospectively"); *cf. Devenpeck*, 543 U.S. at 153–55 (holding officers are not bound by the original offense charged if constitutional probable cause existed to arrest for *any* other offense). Thus, "an arrest consistent with the probable cause standard under the Fourth Amendment will not automatically satisfy the statutory requirements [under] section 804.7." *Veatch*, 858 N.W.2d at 8.

Recall there were several genuine disputes of material fact impacting the probable cause analysis under Plaintiff's Fourth Amendment claim. The same genuine disputes of material fact impact the Court's analysis of whether Plaintiff was falsely arrested and whether Defendant Buck had a reasonable ground for the arrest under Iowa law. Viewing the facts and all reasonable inferences in the light most favorable to Plaintiff, Defendant Buck would not have had reasonable grounds for believing the indictable public offense of participating in a riot—an aggravated misdemeanor—was committed by Plaintiff. The Court concludes a reasonable juror could find Plaintiff was unlawfully restrained against his will, and thus the false-arrest claim (Count One) proceeds to trial by jury. The Court concludes Plaintiff may bring his false arrest claim against Defendants to supplement his direct constitutional tort claims and provide an adequate remedy. *See Wagner v. State*, 952 N.W.2d 843, 861 (Iowa 2020); *Baldwin II*, 915 N.W.2d at 278–79. Due to the similarity of the false-arrest and unreasonable-seizure claims, Defendants' immunity defense is analyzed below under the article 1, section 8 analysis.

2.   Unreasonable Seizure

Article I, section 8 of the Iowa Constitution is "*nearly* identical" to the Fourth Amendment and a warrantless arrest requires probable cause. *See State v. Brown*, 890 N.W.2d 315, 322 (Iowa 2017) (quoting *State v. Short*, 851 N.W.2d 474, 500–01 (Iowa 2014)). However, an equivalent statutory remedy to § 1983 for an unconstitutional arrest does not exist under Iowa

law.  *Godfrey*, 898 N.W.2d at 850.  Instead, direct constitutional tort actions are recognized as

*Godfrey* actions, which are "the state counterpart to a *Bivens* action," and consistent with section

874A of the Restatement (Second) of Torts (Am. L. Inst. 1979).  *Baldwin v. City of Estherville*

*(Baldwin IV)*, 929 N.W.2d 691, 696 (Iowa 2019) (citing *Godfrey*, 898 N.W.2d at 847).

Likewise, if the Iowa legislature declines to provide an adequate remedy to redress a

constitutional injury, it is presumed that a private right of action exists, unless the legislature says

otherwise.  *See Meyer*, 419 F. Supp. 3d at 1133–34; *Godfrey*, 898 N.W.2d at 862; *Venckus*, 930

N.W.2d at 810.  The Iowa Supreme Court has long held that official violations of the search and

seizure provision under the Iowa Constitution may give rise to a suit for damages.  *Godfrey*, 898

N.W.2d at 863 (citing *Girard v. Anderson*, 219 N.W. 400, 403 (Iowa 1934)).  Thus, Plaintiff may

bring his direct state constitutional tort claim under article 1, section 8.

      As with Plaintiff's Fourth Amendment and false-arrest claim, there are genuine disputes

of material fact impacting the Court's analysis of the merits of Plaintiff's claim under article 1,

section 8.  As previously stated, the Court cannot weigh the evidence or determine the credibility

of conflicting evidence.  But viewing the disputed facts and all reasonable inferences in the light

most favorable to Plaintiff, Defendant Buck unreasonably arrested Plaintiff without probable

cause in violation of article I, section 8 of the Iowa Constitution.

      Next, the Court disagrees with Defendants that section 670.4A applies retroactively to

this case.  Plaintiff's action accrued on the date of his arrest.  And when a legislative amendment

impacts a person's substantive rights, it does not operate retrospectively.  *Dindinger*, 860

N.W.2d at 566.  Plaintiff has made the Court aware that there is currently a case pending before

the Iowa Supreme Court regarding the retroactivity problem and whether a similar qualified-

immunity provision—Iowa Code section 669.14A—applies retroactively.  *See Carver-Kimm v.*

*Reynolds et al.*, No. 22-005 (Iowa, argued Nov. 16, 2022).  However, *Carver-Kimm* would only

be dispositive as to the viability of Plaintiff's state free-speech claim.   This is because unlike

federal qualified immunity, due care does not rely on whether the state law right was clearly

established at the time. *Baldwin II*, 915 N.W. 2d at 279; *cf. Harlow*, 457 U.S. at 818.  Thus, if

section 670.4A also applies retrospectively, then the federal qualified-immunity standard

controls, and summary judgment would be appropriate due to the lack of clearly established law.

However, the district court's analysis in *Carver-Kimm*—concluding section 670.4A is

nonretroactive—is compelling and responsive to Plaintiff's due process concerns.  Thus, for

purposes of this Motion, section 670.4A cannot apply retroactively.  The Court need not address

Plaintiff's argument that the Iowa legislature violated the separation-of-powers doctrine by

enacting section 670.4A, because the Court concludes section 670.4A does not apply here.

Therefore, the Court will apply the all-due-care standard in analyzing Defendants' state

immunity defense, pursuant to section 670.4.  "[T]he newly-adopted 'all due care' qualified

immunity defense is available to a municipality," in addition to individual defendants sued in

their official capacity. *Baldwin III*, 333 F. Supp. 3d at 832.  This standard "is more 'stringent'

than the federal [qualified-immunity] standard." *Saunders v. Thies*, No. 4:19-cv-00191, 2020

WL 10731253, at *11 (S.D. Iowa 2020); *Ohlson-Townsend v. Wolf*, No. 18-cv-4093, 2019 WL

6609695, at *8–9 (N.D. Iowa 2019); *Baldwin II*, 915 N.W.2d at 279 (deviating from federal

qualified-immunity law and describing a more nuanced "due care" standard).  In essence, a lack

of due care involves negligence, objective unreasonableness, or the absence of probable cause.

*Baldwin III*, 333 F. Supp. 3d at 842–45; *Baldwin (II)*, 915 N.W.2d at 279.  But "[i]f the officers

exercised due care . . . [then] the City would be immune." *Baldwin IV*, 929 N.W.2d at 698; *see*

*also* § 670.4(1)(c).  And unlike federal *Monell* claims, if individual officers neglect to exercise

due care, then the municipality may be held liable under a respondeat superior theory of liability. *Id.* at 696; *see also Williams*, 516 F. Supp. 3d at 873 ("[R]espondeat superior liability is actionable under the Iowa Constitution against municipalities for conduct by their employees within the scope of their job duties."). "Because the question is one of immunity, the burden of proof is on the defendant" to prove they acted with due care. *Baldwin II*, 915 N.W.2d at 280.

Here, Defendant Buck has not met his burden or provided evidence demonstrating that he exercised due care. *See Baldwin II*, 915 N.W.2d at 280. Viewing the disputed facts and reasonable inferences from those facts in the light most favorable to Plaintiff, Buck lacked probable cause to arrest Plaintiff under Iowa law, which shows a lack of due care. Thus, Defendants Buck and the City are denied qualified immunity under section 670.4(1)(c) as to Plaintiff's false-arrest and unreasonable-seizure claims.

3. Free Speech

Finally, article I, section 7 of the Iowa Constitution guarantees: "Every person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech, or of the press." In addition, "the Iowa Constitution generally imposes the same restrictions on the regulation of speech as does the federal constitution." *State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997). Similarly, the Eighth Circuit held in *Ackerman v. State*: "We assume without deciding that the Iowa Supreme Court would recognize [a direct article 1, section 7] claim, which is based on the same facts as [the plaintiff]'s First Amendment retaliation claim. The parties have not identified any meaningful difference between the state and federal constitutional protections." 19 F.4th 1045, 1062 (8th Cir. 2021). Thus, consistent with *Ackerman*, Plaintiff may bring a direct cause of action under article 1, section 7 of the Iowa Constitution.

In this instance, Plaintiff argues Defendants violated his state constitutional free-speech right to record and observe police officers (Count Five).  Unlike Plaintiff's First Amendment claim (Count Four), the Court must apply Iowa's due-care-immunity standard under section 670.4(1)(c).  Because the absence of clearly established law is not a requirement for state due-care immunity, the Court proceeds to the merits of Plaintiff's claim using the federal standard for retaliatory arrest in violation of the First Amendment.  *See Baldwin II*, 915 N.W.2d at 279; *see also Welch*, 51 F.4th at 811.  If a state constitutional violation occurred, then Court will determine whether Defendants are immune under section 670.4(1)(c).

Again, there are four components of a retaliatory-arrest claim which demonstrate a violation of the right to freedom of speech.  *See Welch*, 51 F.4th at 811.  "[A] plaintiff must show that (1) [they] engaged in protected activity, (2) the officer [took an adverse action] that would chill a person of ordinary firmness from continuing the protected activity, . . . (3) the [adverse action] was motivated by the exercise of the protected activity," and (4) "the officer acted without probable cause to arrest."  *Id.* (citations omitted).  It is undisputed that Plaintiff had a state right to criticize the police and peacefully observe a lawful protest under article 1, section 7 of the Iowa Constitution.  *See State v. Elliston*, 159 N.W.2d 503, 508 (Iowa 1968) ("[O]ur constitutional command of free speech and assembly is basic and fundamental and encompasses peaceful social protest, so important to the preservation of the freedoms treasured in a democratic society.") (citing *Cox v. Louisiana*, 379 U.S. 559, 574 (1965)); *Welch*, 51 F.4th at 813 (citations omitted).  Notably, the Iowa due-care standard permits defining Plaintiff's free-speech right at a higher level of generality compared to federal qualified-immunity standard. When the disputed facts in this case are viewed in the light most favorable to Plaintiff, shoving and then tackling someone from behind in these circumstances would undoubtedly chill a person

of ordinary firmness from continuing their constitutionally protected activity.  *See Welch*, 51 F.4th at 811.  Thus, a reasonable juror could find two of the four elements of Plaintiff's state retaliatory-arrest claim are satisfied.  *See id.*

However, the most difficult element of Plaintiff's free-speech claim is demonstrating the "but-for cause" of his arrest was retaliatory animus for exercising his free-speech right.  *Nieves*, 139 S.Ct. at 1725; *see Mitchell*, 28 F.4th at 898.  Plaintiff argues he was singled out and treated disproportionally compared to his friend and many other individuals on Court Avenue.  The parties make two additional allegations in support of whether Plaintiff was singled out: (a) Defendants argue video evidence *might* show Plaintiff's friend also had a camera at the time; and (b) Plaintiff claims after he was tackled, an *unknown* officer attempted to go through his phone to view his photos or videos, but it was locked.  These claims are unsubstantiated by the record.  Mere allegations are not enough to defeat summary judgment, so the Court declines to consider these two disputes in ruling on Defendant's Motion.  *See Anderson*, 477 U.S. at 248.  However, there are several genuine factual disputes to survive summary judgment under the Court's Fourth Amendment analysis that equally impact Plaintiff's state free-speech claim.  Viewing the disputed facts in Plaintiff's favor, constitutional probable cause to arrest him for the offense of rioting was absent, which weighs heavily in support of Buck's improper retaliatory motive.  *See Nieves*, 139 S.Ct. at 1724.  A reasonable juror could find Buck targeted Plaintiff and treated him differently than his friend because he was recording officers with his cellphone during the George Floyd protest.  Plaintiff's was otherwise a silent and nonthreatening observer of a protest, walking away from officers at the time of his arrest.

Because the evidence does not conclusively show what happened at the time of Plaintiff's arrest, let alone whether Buck was objectively motivated by retaliatory animus, the Court denies

summary judgment as to Plaintiff's claim under article 1, section 7 of the Iowa Constitution

(Count Five).  *See also Welch*, 51 F.4th at 812; *Quraishi*, 986 F.3d at 839 (leaving factual dispute

over retaliatory motive for the jury).  Likewise, viewing the genuinely disputed material facts in

Plaintiff's favor, Buck acted unreasonably and failed to exercise due care to conform with

section 670.4.  Because Buck lacks state qualified immunity, so does the City, and Plaintiff's

state free-speech claim survives summary judgment.  To summarize, as to Defendants Buck and

the City, Plaintiff's common-law tort claim for false arrest/imprisonment (Count One) and

Plaintiff's state constitutional tort claims for unlawful arrest (Count Three) and violation of free

speech (Count Five) under the Iowa Constitution survive summary judgment.  Plaintiff's state

claims against unknown DMPD officers are dismissed.

IV.     CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment (ECF No. 48) is

DENIED in part and GRANTED in part.  Defendants' Motion is DENIED as to Defendant Buck

under Counts One, Two, Three, and Five.  Defendants' Motion is GRANTED as to Buck under

Count Four.  Defendants' Motion is GRANTED as to Defendant City under Counts Two and

Four.  Defendants' Motion is DENIED as to the City under Counts One, Three, and Five.  And

finally, Defendants' Motion as to the unknown DMPD officers is GRANTED and the unknown

DMPD officers are dismissed from this action.  The case shall proceed to trial by jury.

IT IS SO ORDERED.

Dated this 30th day of March, 2023.

ROBERT W. PRATT, Judge
U.S. DISTRICT COURT